IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GERARD R. SMAGALA, ) ) Plaintiff, ) ) v. ) ) CAROLYN COLVIN,[1] ) Commissioner of Social Security, ) ) Defendant. ) ) | No. 12 C 4547 Magistrate Judge Maria Valdez |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Gerard Smagala's claim for Disability Insurance Benefits and Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Smagala's motion for summary judgment is denied, and the Commissioner's cross-motion for summary judgment [Doc. No. 28] is granted.

---

[1] Carolyn Colvin is substituted for her predecessor pursuant to Federal Rule of Civil Procedure 25(d).

1

# BACKGROUND

## I. PROCEDURAL HISTORY

Smagala applied for Disability Insurance Benefits and Supplemental Security Income on October 22, 2008, alleging a disability due to borderline intellectual functioning and low IQ since July 1, 2004. (R. 10, 181-90.) The applications were denied on March 13, 2009 and upon reconsideration on June 22, 2009. (*Id.*) Smagala filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on September 15, 2010.[2] (*Id.*) Smagala, who was not represented by counsel, personally appeared and testified at the hearing. (R. 10, 35-107.) A medical expert and a vocational expert also testified at the hearing. (R. 10.)

On March 16, 2011, the ALJ denied Smagala's claim for benefits and found him not disabled under the Social Security Act. (R. 7-20.) The Social Security Administration Appeals Council denied Smagala's request for review on April 26, 2012, (R. 4-6), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

---

[2] An initial hearing was held on May 12, 2010, but no substantive testimony was taken. Smagala instead asked for a continuance in order to seek representation. The ALJ allowed the continuance but advised Smagala that the next hearing would proceed whether or not he had secured a representative. (R. 10, 25-34.)

## II. FACTUAL BACKGROUND

### A. <u>Background</u>

Smagala was born on July 12, 1957, and was fifty-three years old at the time of the ALJ hearing. (R. 49.) Smagala lives alone in a studio apartment. (R. 15, 55.) He graduated from high school but was a C student. (R. 65, 92.) Smagala was previously employed in a number of different jobs, including roofer, laborer, packager, order picker, forklift driver, and material handler. (R. 49- 86-95, 202-04, 210-12.) He also received Social Security benefits from 1995 to 2008. (R. 10 n.1, 24, 44.)

### B. <u>Testimony and Medical Evidence</u>

#### 1. *Smagala's Testimony*

Smagala testified that he had a nervous breakdown in approximately 1999, after he was divorced, his mother passed away, and he had to care for his blind father, who was on dialysis. (R. 42-43.) He was hospitalized at the time for two to three weeks, and then he was recommended to Foxfire day treatment center, where he went for counseling and treatment over a period of two or three years until 2000. (R. 58-60.) He was on medication, including Lithium and briefly Zoloft, but he experienced side effects from Zoloft. (R. 60.) He states that he was diagnosed with manic depression at Foxfire before his alleged onset date of July 1, 2004. (R. 61.) From July 2004 until the time of the hearing, he had not received treatment or medication for any mental health issues, and he only saw a psychiatrist for evaluations. (R. 61-63, 69.) Smagala testified that although he had access to doctors

through Medicare from 2004 to 2008, he did not feel the need to see anyone. (R. 63-64.) He said that he was gradually taken off of Lithium while at Foxfire because he was doing well and was "balanced out." (R. 63.)

Smagala stated that he left most of the jobs he had over the years for various reasons, but he never had difficulty working with supervisors and co-workers and generally has an easygoing personality and did as he was told. (R. 43-44.) He did not return to work as a roofer because he found out he would first need to pay back dues to the union, and he had only applied for a couple of other jobs, at Jewel and the YMCA. (R. 64-65.) Smagala also did not pursue job placement through any state agency. (R. 66.) He explained that he did not look for work very much because he did not think anyone would hire him due to his age and work experience. (R. 65-66, 101.) He is not entirely sure what prevents him from working, and he does not know why he quit various jobs. (R. 68.)

He testified that he applied for Social Security when his prior receipt of benefits was stopped after determination that he had been overpaid funds because he engaged in substantial gainful employment.[3] (R. 10 n.1, 45-47.) Smagala stated that he did not actually receive many of those funds, because they were misused by his sister or brother, who were his payees at the time. (R. 45-47, 70-72.)

---

[3] The record reflects that Smagala earned $1,082.05 in 1995; $9,317.84 in 1996; $13,749.26 in 1997; $11,482.65 in 1998; $15,709.71 in 1999; $2,134.96 in 2000; $5,378.66 in 2001; $1,368.50 in 2002; $6,228.62 in 2003; $2,063.79 in 2004; and he had no reported income from 2005-2010. (R. 210-13.)

4

Smagala does his own grocery shopping and also gets food from a church pantry in exchange for helping set up and distribute the food. (R. 56-57.) He is able to drive but does not currently own a car, although he occasionally borrows a car from a friend. (R. 55-57.) He also walks, rides his bike, and takes public transportation. (R. 57.) He is able to read the newspaper, he filled out all of the Social Security paperwork by himself, and he can read and understand an application. (R. 67-68.)

    2.    *Medical Evidence*

        a.    <u>Susan Frederiksen, M.D.</u>

Dr. Frederiksen completed a psychiatric consultative examination ("CE") report after a thirty-five minute interview on July 18, 2002, eight days after the death of Smagala's father. (R. 310-12.) She noted that Smagala was a limited historian, had a "perplexed air about him," was anxious, and did not have spontaneous speech. He found it difficult to express his thoughts and would give uncertain tentative responses.

She concluded that it was difficult to make a diagnosis due to the limited amount of information available, but opined that chronic schizophrenia with predominant negative symptoms was possible. Dr. Frederiksen also found that Smagala seemed to have avoidant, schizoid, dependent features in his personality. His ability to maintain attention and concentration was moderately impaired, and his ability to comprehend instructions was intact but limited to concrete tasks. Smagala's ability to initiate, sustain, and complete tasks in a competitive work

environment appeared to be moderately to markedly impaired, and his ability to get along with co-workers and supervisors and to withstand normal work pressure appeared to be markedly impaired.

          b.      <u>Dianne Stevenson, Psy. D.</u>

Dr. Stevenson tested and interviewed Smagala over a period of four hours on January 14, 2006. (R. 297-300.) She noted that Smagala did not offer spontaneous conversational speech, his memory appeared to falter at times, and his conversation was often tangential and circumstantial. She administered the Wechsler Adult Intelligence Scale-III ("WAIS-III") test, and Smagala's full-scale IQ was measured at 79, which is borderline to low average. His verbal comprehension score was 89 (average) and was much higher than his perceptual organization ability score, which was 74 (borderline impaired). On the Wide Range Achievement Test-2, Smagala tested at the post-high school grade equivalent in reading, the high school equivalent in spelling, and the fifth grade equivalent in arithmetic.

Based on the results of the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") test, Dr. Stevenson noted no significant elevations, although certain items indicated fearfulness, problems with family members, low self-esteem, and depression. She opined that he is deficient in interpersonal and social skills and finds it difficult to trust anyone deeply.

Dr. Stevenson concluded that Smagala's intellectual functioning is in the borderline to low average range. He is a loner, finds it difficult to vary his life experience, tends to be frustrated by his lack of accomplishment, has feelings of

6

helplessness and hopelessness, and is worried about his future. He depends on others for direction and help with decision making. Dr. Stevenson diagnosed Smagala with Bipolar Disorder, Recurrent, Unspecified (per report); Personality Disorder NOS, with avoidant and dependent traits; and Borderline Intellectual Functioning. She concluded that Smagala would be unable to function in a normal work-like setting.[4]

   c. Jeffrey Karr, Ph.D,

Dr. Karr, a licensed clinical psychologist, examined Smagala for fifty minutes and completed a psychological report on February 19, 2009. (R. 337-40.) Dr. Karr observed that Smagala was polite and pleasant but appeared ill at ease and anxious, and he had pressured speech. He also described to Dr. Karr that he was compelled to engage in certain activities, such as cleaning, attending mass, and taking walks. Dr. Karr's diagnosis was Bipolar Disorder (per history) and OCD.

   d. Tyrone Hollerauer, Psy.D.

DDS physician Dr. Hollerauer completed a Psychiatric Review Technique ("PRT") and a Mental Residual Functional Capacity ("RFC") assessment in March

---

[4] Three copies of Dr. Stevenson's report are in the record. Two appear to be identical copies and were included as part of the same exhibit before the ALJ. (R. 297-304.) A third, (R. 293-96), was also before the ALJ but was offered as a separate exhibit. The third report is nearly the same as the other two except with respect to certain redactions. In the two identical reports, certain information is "whited out"; in the third, it is redacted with a black pen. Most of the redactions are the same. However, in the two identical reports, Dr. Stevenson's conclusion states that "Gerald Smagala would be unable to function in a normal work-like setting"; in the third report, the letters "un" are redacted, and thus the conclusion is that Smagala would be able to function in a work-like setting. The discrepancy is not explained in the record.

7

2009. (R. 341-69.) During the interview, Smagala was cooperative and had no problem with memory, concentration, or in answering questions.

He concluded that Smagala had impairments in the categories of Affective Disorders (Listing 12.04), based on Bipolar Disorder by history, and Anxiety-Related Disorders (Listing 12.06), based on OCD features. Under the B criteria of the listings, Dr. Hollerauer found that Smagala had mild limitations in his activities of daily living and moderate limitations in the areas of maintaining social functioning and concentration, persistence, or pace, with one or two episodes of decompensation. Dr. Hollerauer stated that his functional limitations did not meet or equal a listing.

Dr. Hollerauer's Mental RFC found that Smagala was moderately limited in his ability to understand, remember, and carry out detailed instructions; to work in coordination or proximity to others; to complete a normal workday without interruptions from psychologically based symptoms; and to accept instructions and respond appropriately to criticism. He was not found to be significantly limited in any other area. Dr. Hollerauer opined that Smagala was in the low average range intellectually and could understand and carry out simple instructions, but he would be limited to unskilled tasks.

e. <u>Roy Gilliland, Ph.D.</u>

Dr. Gilliland prepared a psychological evaluation on September 13, 2010, two days before the ALJ hearing.[5] (R. 387-88.) Smagala reported to Dr. Gilliland that he had "leveled out" and thus had not taken any medications for his psychological problems since 2000. He also stated that he was not currently experiencing significant symptoms of bipolar disorder. His speech was fluent, logical, and coherent, although he appeared anxious with constricted affect. Smagala's thought process was disorganized and often required redirection. Dr. Gilliland found that Smagala's insight and judgment appeared good.

Testing suggested minimal depression and mild anxiety. The MMPI-2 test revealed the highest elevated scale associated with individuals who are socially introverted and have difficulty in social situations. Dr. Gilliland concluded that his social phobia symptoms appeared to be limiting in terms of psychosocial functioning. He did not demonstrate any clinical symptoms other than some distractibility. Dr. Gilliland recommended a referral to a psychiatrist or counselor in the event that Smagala's symptoms worsened. Smagala was ultimately diagnosed with Bipolar Disorder NOS, and R/O Social Phobia.

### 3. *Medical Expert's Testimony*

Dr. Michael Cremerius testified at the hearing as a medical expert. Dr. Cremerius stated that Smagala's medically determinable impairments supported by

---

[5] The ALJ left the record open for two weeks in order to allow the record to include evaluations that were not available on the date of the hearing. (R. 83-84, 105.)

the record include borderline intellectual functioning (Listing 12.02) based on a full-scale IQ of 79, which is in the borderline low-average range; Bipolar Disorder (Listing 12.04); OCD features (Listing 12.06); and personality disorder (Listing 12.08). (R. 73-74.)

Dr. Cremerius pointed out that Dr. Stevenson's January 2006 CE provided the diagnosis of bipolar disorder and borderline intellectual functioning, and the February 2009 psychological CE performed by Dr. Karr diagnosed bipolar disorder by history. (R. 75.) He opined that there was little additional evidence of psychological limitations in the file. (R. 75.)

When asked to evaluate the B criteria, Dr. Cremerius concluded that based on the record, Smagala's presentation at the hearing, and the fact that the claimant had not been in any psychiatric treatment or on medications for a number of years, Smagala has at best only mild limitations in his activities of daily living; mild impairments in social functioning; only mild limitations in concentration, persistence, and pace; and no periods of decompensation during the relevant time frame. (R. 77-78, 80-81.) Dr. Cremerius concluded that Smagala's Mental RFC would include minimal limitations, and he would not be limited to simple, routine work but instead could perform a variety of semi-skilled tasks. (R. 80-81.)

4. *Vocational Expert's Testimony*

Edward Steffan testified at the hearing as a Vocational Expert ("VE"). The VE questioned Smagala in detail in order to properly classify his past work experience. (R. 85-94.) ALJ asked the VE whether there would be any work

available for a hypothetical individual with Smagala's age, education, full scale IQ of 79, and work experience, with no exertional limitations, but limited to semi-skilled work. (R. 95-96.) The VE responded that the individual would be able to perform all of Smagala's past work. (R. 96.) The ALJ also asked whether work exists for such a person if he were limited to simple, routine, unskilled tasks. (R. 96-97.) The VE testified that such a person could perform a number of jobs, including Smagala's past job as an order filler, as well as mail clerk (5,000 jobs in the region); office helper (more than 15,000 jobs); small products assembler (more than 15,000 jobs); and outside delivery. (R. 97-100.) Next, the ALJ added to the hypothetical a limitation that the person would sometimes be slow in responding, and the VE concluded that the assembler job would be eliminated, but he could perform the other unskilled jobs, which are independently performed tasks. (R. 99-100.)

### C. **ALJ Decision**

The ALJ found that Smagala met the insure status requirements of the Social Security Act through March 31, 2009, and he had not engaged in substantial gainful employment since the alleged onset date of July 1, 2004. (R. 12.) At step 2, the ALJ concluded that Smagala had severe impairments of borderline intellectual functioning/low IQ and non-severe impairments of bipolar disorder by history, obsessive compulsive features, and personality disorder. (R. 13.) At step 3, the ALJ found that none of Smagala's impairments, alone or in combination, met or equaled a listing. (R. 13-14.)

The ALJ next determined that Smagala had the RFC to perform a full range of work at all exertional levels, limited to semi-skilled work. (R. 14-18.) The ALJ concluded that Smagala was capable of performing his past relevant work as a material handler, general laborer, forklift operator, and order filler and thus was not disabled under the Social Security Act. (R. 18-20.)

## DISCUSSION

I. **ALJ LEGAL STANDARD**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.*

Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence

with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

### III. ANALYSIS

Smagala argues that the decision was in error because the ALJ: (1) did not properly evaluate the medical opinions, particularly that of Dr. Stevenson; (2) did not properly evaluate Smagala's credibility; and (3) did not sufficiently develop the record.

#### A. Medical Evidence

Plaintiff argues that the ALJ improperly rejected Dr. Stevenson's opinion that Smagala would be unable to work in a competitive environment in favor of that of testifying expert Dr. Cremerius. The ALJ assigned little weight to Dr. Stevenson's opinion because it was inconsistent with Smagala's activities of daily living and the record as a whole. She assigned significant weight to Dr. Cremerius's

14

opinion because it was more consistent with the record, he had the benefit of additional evidence, and he was able to observe Smagala at the hearing. (R. 17.) She further noted that the opinion of Dr. Gilliland, who was a consultant chosen by Plaintiff and whose report was submitted after the hearing, also did not recommend further treatment unless Smagala's condition worsened.

As a general rule, opinions of examining physicians are given more weight than those of non-examining physicians. *See* 20 C.F.R. § 404.1527(c)(1). However, Dr. Stevenson was a consultant, not a treating physician, and therefore the ALJ was not required to give her opinion controlling weight.[6] *See White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Furthermore, her opinion, which predated those of Drs. Karr, Hollerauer, Cremerius, and Gilliland by several years, was not consistent with the record as a whole in a way that would support a finding of total disability.[7] Plaintiff's emphasis on consistencies in the record with regard to his limitations is unpersuasive. It is not disputed that Smagala has impairments and limitations, and the ALJ's decision took those into consideration. The issue is whether his limitations are disabling, and Dr. Stevenson's opinion is the only evidence in the record supporting that finding. The ALJ's decision to assign little weight to Dr.

---

[6] Contrary to Plaintiff's argument, the fact that Dr. Stevenson spent four hours with Smagala, longer than any other consultant, is not so relevant that the ALJ's failure to mention it in the decision warrants reversal. Dr. Stevenson administered four separate tests during her consulting examination, including the WAIS-III, which was more testing than any other consultant performed.

15

Stevenson's opinion was therefore supported by substantial evidence. *See Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004).

Similarly, the Court does not find error with the ALJ's development of the record at the hearing. Her failure to question Dr. Cremerius about specific aspects of the record that Plaintiff believes are inconsistent with his opinion was at best harmless error. Plaintiff has failed to demonstrate that even if Dr. Cremerius had credited some of the more restrictive limitations given in some of the medical evidence, he would not be capable of performing the independent, unskilled jobs which the VE testified exist in significant numbers in the regional economy.

B.  **Credibility**

In her ruling, the ALJ found Smagala's allegations of disabling limitations less than fully credible based upon his wide range of daily activities; the fact that he has not sought medical treatment or taken medication since his alleged disability onset date; and that his main contention at the hearing was that he believed no one would hire him, which is not a basis for a disability determination. (R. 15.)

The Court concludes that the ALJ's credibility finding was adequately supported. An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431,

---

[7] As discussed *supra* note 4, it is not entirely clear that Dr. Stevenson did conclude that Smagala was unable to perform work activity, but for purposes of this decision, the Court assumes that she did.

16

435 (7th Cir. 2000). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[8] "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id.* at *1. In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id.* at *5.

---

[8] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

17

Plaintiff argues that the ALJ's credibility analysis was erroneous because it included a meaningless boilerplate statement,[9] and additionally that the ALJ's stated reasons were insufficient. First, the mere presence of the boilerplate language is insufficient grounds for remand where, as in this case, the use of the boilerplate is incidental. *See, e.g.*, *Carter v. Astrue*, 413 Fed. Appx. 899, 905-06 (7th Cir. 2011).

Second, substantial evidence supported the ALJ's credibility finding. Although Plaintiff correctly argues that an ALJ may not equate daily activities with the requirements of competitive work, the ALJ has not done so here. She listed certain of his daily activities but did not suggest that the list was exhaustive or equated to a work environment. The problem for Plaintiff is that he has offered no activities he is not able to do as a result of a disabling condition. To the extent the record reflects anxiety in social situations, the jobs of office helper, mail clerk, and order filler are independently performed tasks. The record does not require the ALJ to have found that Smagala's social limitations are wholly disabling.

---

[9] The following is the language in question: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 15.) This "credibility template" has been subject to criticism because of its meaninglessness and the circular logic that it embraces. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (finding the template "gets things backwards," and is "meaningless boilerplate" that "implies that ability to work is determined first and is then used to determine the claimant's credibility").

There is also substantial evidence supporting the ALJ's finding that Smagala's failure to receive any mental health treatment eroded his credibility. An ALJ must consider a claimant's reasons for not seeking treatment, *see* SSR 96-7p, at *7, and in this case, the reason was that Smagala himself felt he had "balanced out" or "leveled out." Plaintiff argues at length that his reason for not seeking treatment was that he had limited insight, but the record does not support this claim. Smagala stopped taking medication under a physician's care, not because he alone decided he did not need it. Moreover, none of the psychological opinions in the record recommended further treatment at any relevant time frame; the recommendations only stated that he should pursue treatment if his symptoms worsened. The Court therefore concludes that the ALJ's credibility determination was not patently wrong and was adequately supported by the record.

## CONCLUSION

For the foregoing reasons, Plaintiff Gerard Smagala's motion for summary judgment is denied, and the Commissioner's cross-motion for summary judgment [Doc. No. 28] is granted.

**SO ORDERED.**   **ENTERED:**

*Maria Valdez*

**DATE:   March 31, 2014**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**